804 P.2d 805

Steven Rande WHITE, Plaintiff–Appellant,

v.

Samuel LEWIS, Director of the Arizona Department of Corrections, Defendants–Appellees.

No. 1 CA–CV 88–615.

Court of Appeals of Arizona, Division 1, Department B.

Sept. 27, 1990.

Review Denied Feb. 20, 1991.

Robert K. Corbin, Atty. Gen. by Pamela J. Eaton, Asst. Atty. Gen., Phoenix, for defendants-appellees.

Steven Rande White, Phoenix, in pro. per.

## OPINION

LEVI RAY HAIRE, Judge.

The trial court granted summary judgment for Defendants–Appellees, Sam Lewis and the Arizona Department of Corrections (collectively, the Department), on the complaint filed by Plaintiff–Appellant, Steven Rande White. White was an inmate at the State Prison in Florence, Arizona. White claimed that, as a result of the Department's indigence policy, he was denied his constitutional rights of access to the courts, access to his family and friends, and access to sanitary supplies. The trial court granted the Department's motion for summary judgment after White failed to appropriately respond to the Department's motion.

## BACKGROUND

White objects to the Department's indigence policy which provides that an inmate is eligible for indigence status only if his prison account contains less than $12 for the thirty days preceding the inmate's application. According to White, an indigent inmate need not pay for the following supplies:

(1) soap, shampoo, deodorant, laundry soap, bath soap, toothpaste, toothbrush, comb, razors, and cleaning supplies;

(2) postage for three pieces of non-legal mail per week;

(3) unlimited photocopies of legal documents and copies of applicable rules of court;

(4) postage for all legal correspondence; and

(5) envelopes and paper.

However, a non-indigent inmate must pay for his own supplies.

In February 1988 White filed a verified complaint against the Department. White sought a declaratory judgment that the Department's indigence policy violated his constitutional rights and sought $123,000 in damages. With respect to his claim of denial of access to the courts, White alleged in his complaint that on January 12, 1988, he was advised that he would no longer be allowed to receive photocopies or envelopes for his legal correspondence. White claimed that, as a result, he was forced to settle a civil rights case against the Sheriff of Pinal County for a substantially lower amount than he otherwise would have. White claimed that he had been denied his fourteenth amendment right of due process because the indigence policy impeded his ability to prosecute that case. White also stated that he had several other cases pending in state and federal courts.

With respect to his claim of denial of access to his family and friends, White explained in his complaint that he could not afford to purchase the stamps, envelopes, and paper required to correspond with them. White claimed that he had been denied his first amendment right to communicate with his family and friends because the Department's policy allowed the Department to take money from his prison account to pay for his photocopying and his postage for legal documents, leaving him no money for correspondence with his family and friends.

White also complained of an alleged denial of sanitary supplies. He stated in his complaint that he was unable to purchase laundry and bath soap, a comb, toothpaste, or a razor. He claimed that the alleged denial violated his eighth amendment right not to be subject to cruel and unusual punishment because he was unable to keep himself clean. He also claimed that because he did not receive the laundry detergent and clothes washing services that inmates in other prisons received, he had been denied equal protection of the law guaranteed by the fourteenth amendment.

On June 28, 1988, the Department filed a motion for summary judgment. With respect to White's claim that he was forced to settle another lawsuit on January 12, 1988, because he was denied photocopies,

the Department attached the affidavit of Anita Reel, a correctional services officer. Reel explained that White became ineligible for indigence status on November 5, 1987, and that he had not reapplied for indigence status when he again became eligible. She attached and summarized the library log, which indicated that White had received hundreds of photocopies, regardless of his ability to pay, from October 1987 through January 1988. For example, from January 3 to January 19, 1988, White received 832 pages of photocopying. Reel explained that White's photocopying privileges were suspended for two days on January 12, 1988, because he was suspected of photocopying legal material for other inmates. Reel attached copies of incident reports alleging that White had photocopied other inmates' material and attached copies of some of the other inmates' material copied by White. The Department also argued that, even if White had received insufficient photocopying, he could have used carbon paper. Reel stated that, regardless of whether White was indigent, he was always given legal supplies including typing and pleading paper, carbon paper, pens, clips, a typewriter, and a typewriter ribbon. With respect to White's claim that he was denied access to family and friends, the Department argued that inmates have no constitutional right to free non-legal mail regardless of indigence. *See Kaestel v. Lockhart,* 746 F.2d 1323, 1325 (8th Cir. 1984). The Department argued that White chose to spend his money on his litigation, not on his family and friends.

With respect to White's claim that he was denied sanitary supplies, the Department attached the affidavit of Gary Busk, another correctional services officer. Busk stated and attached indigent supply lists indicating that White received sanitary supplies on three occasions in October and November, 1987, regardless of whether he was indigent.

On June 23, 1988, Jerry Conn, an inmate legal assistant helping White, wrote a letter to the trial court. He explained to the court that he had prepared non-uniform interrogatories, a request for production of documents, and a request for admissions to be served on the Department in this case, but that White could not afford to copy or mail those documents. He requested the trial court to order the Department to assure them that White could properly litigate his case.

On July 18, 1988, White moved for a twenty-day extension of time to file his response to the Department's motion for summary judgment. He explained that on July 8 he had been placed in detention and that his legal assistant, Conn, had arranged to see him on July 11 but needed additional time to prepare his response. The trial court granted an extension until August 2, 1988, for the filing of White's response to the Department's motion for summary judgment.

On July 21, 1988, Conn again wrote to the trial court. He stated that the Department had placed White in detention in order to punish him for litigating this case and that the Department had attempted to sabotage this case by forcing White to switch to legal assistants who were unfamiliar with it.

On July 27, 1988, White also wrote to the trial court. He advised the court that he had now been released from detention, but that Conn was no longer authorized to help him. He urged that he needed Conn's help in order to respond to the Department's motion for summary judgment. In explaining why he had been placed in detention, he noted that copies of certain "incident reports" had been attached to the Department's statement of facts concerning its motion for summary judgment. One of these incident reports stated that another identified inmate had notified the Department that White had copied other inmates' legal work. White admitted that on July 7, 1988, he and Conn approached this inmate with their copy of that incident report. He stated that they merely wanted "to afford the inmate the opportunity to challenge the factualness of the report with respect to his alleged actions." He advised the court that on the next day he was placed in detention.

White also notified the trial court that on August 3, 1988, he had served upon the Department non-uniform interrogatories, a request for admissions, and a request for production of documents.

The trial court treated White's July 27, 1988, letter as a motion claiming interference with legal process, and requested that the Department respond to White's motion. Again, the court extended the time for the filing of White's response to the Department's motion for summary judgment.

In response to White's letter, the Department advised the trial court that White had been placed in detention based on the Department's conclusion that White and Conn were attempting to intimidate the inmate named in the incident report. The Department took the position that White was not entitled to the help of a particular legal assistant such as Conn. Based on the discovery documents White had just served on the Department, the Department concluded that "[i]t is obvious from this documentation that either plaintiff can litigate adequately for himself or he, at this point, has a new inmate assistant or he is still being aided by Mr. Conn."

On August 17, 1988, White again wrote to the trial court. White explained that he had filed those discovery documents before he was placed in detention. White requested that if the trial court determined that Conn need not assist him, then the trial court should appoint counsel for him.

On September 7, 1985, the trial court concluded that the Department's decision to provide White with a different legal assistant did not interfere with White's legal process:

The issue mainly comes down to whether Plaintiff has a right to the assistance of a particular person previously assigned to him as a writ writer in connection with the present proceedings. The Court does not find from the information that has been provided to the Court that there has been any inference [sic] with any recognized legal right or process by Defendant's decision to provide Plaintiff with a different legal assistant.

The trial court again extended the time for the filing of White's response to the Department's motion for summary judgement, this time to September 25, 1988.

On September 6, 1988, White wrote to the trial court, stating that although he was then approved for indigence status, the new security officer refused to provide him with photocopying. White requested that the trial court correct this problem.

On September 12, 1988, White again wrote to the trial court advising that by September 16 he would have earned $12, and that he would be ineligible for indigence status and would no longer be provided with postage, photocopying, or sanitary supplies. He also stated that he had a deficit of over $90 for past legal obligations and that his money would be withheld until that deficit was paid. He requested a telephonic hearing with the warden so that the warden could explain how White could obtain legal assistance for his case.

On September 23, 1988, the trial court again reminded White that he had to respond to the Department's motion for summary judgment by September 25, 1988. However, no response was filed. Thereafter, on October 12, 1988, the trial court granted the Department's motion for summary judgment:

Defendant's Motion for Summary Judgment has come on for ruling. The Court has received no Response to the Motion for Summary Judgment after having granted several extensions of time for filing a Response, the last being on September 7, 1988. In reviewing the Motion for Summary Judgment, the Court finds that the Motion addresses each of the issues raised by Plaintiff and that the record, at the present time, shows that there are no material issues of fact in dispute and that Defendant is entitled to Judgment as a matter of law.

On October 18, 1988, White wrote to the trial court requesting that the trial court reconsider its order granting the Department summary judgment or, in the alternative, that his letter be considered as his notice of appeal. White stated that he was not merely being denied the help of Conn,

he was being denied the help of any legal assistant. He asserted that he had submitted several requests for the appointment of a legal assistant and had received no response. White objected that because he did not have any legal assistant, he could not create a record sufficient to overcome the Department's motion for summary judgment. He noted that his claim was not frivolous because the United States District Court in *Gluth v. Arizona Department of Corrections*, No. 84–1626 PHX CAM, had found that the indigence policy "forced inmates to choose between purchasing essential hygienic supplies and essential legal supplies."

In response to White's motion for reconsideration, the Department argued that indigent inmates were guaranteed access to the courts either through legal assistance or through an adequate law library. *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72, 83 (1977).

On October 25, 1988, the trial court denied White's motion for reconsideration:

In reviewing the file in this matter, the Court notes that it granted extensions of time to file a Response to the Motion for Summary Judgment on July 20, 1988, August 11, 1988, and on September 7, 1988. Thereafter no Response was filed; no further extensions were requested. In the interim, this Court has received numerous items of correspondence from Mr. White which indicates that he is articulate and, apparently, able to make appropriate use of legal authority as he has done in citing case law in his latest letter and petition to this Court.

## DISCUSSION

The trial court granted summary judgment because it found that the Department's motion for summary judgment addressed each of White's claims and that White had failed to respond to the Department's motion.

White argues that he raised several issues of material fact in his verified complaint. He explains that we must examine the entire record, including his complaint, in reviewing the summary judgment. *See*

*Ferree v. City of Yuma*, 124 Ariz. 225, 226, 603 P.2d 117, 118 (App.1979).

In light of the volume and complexity of modern litigation, we consider the cases requiring a trial court or an appellate court to search the entire record in connection with a motion for summary judgment to be contrary to modern authority. It is the attorney's responsibility to search the record:

It is also the policy of the court that neither we, the trial court, nor the court of appeals should be required to perform counsel's work by searching the record to attempt to discover facts which establish or defeat the motion [for summary judgment]. These are tasks which must be left to counsel.

*Mast v. Standard Oil Co. of Cal.*, 140 Ariz. 1, 2, 680 P.2d 137, 138 (1984). As explained in Rule IV(b) of the Uniform Rules of Practice of the Superior Court of Arizona, "if the opposing party does not serve and file the required answering memorandum, ... such non-compliance may be deemed a consent to the ... granting of the motion, and the court may dispose of the motion summarily."

White argues that he was not able to search the record and to respond the Department's motion for summary judgment because he was denied Conn's assistance. In the alternative White states that he was not able to respond because he was denied the help of any legal assistant. White argues that this alleged denial deprived him of access to the trial court.

The right of access to the courts requires the Department to provide inmates with adequate law libraries *or* adequate assistance from persons trained in the law. *See Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72, 83 (1977) (habeas corpus proceeding); *Wolff v. McDonnell*, 418 U.S. 539, 577–80, 94 S.Ct. 2963, 2985–86, 41 L.Ed.2d 935, 963–64 (1974) (civil rights proceeding); *Knight v. Superior Court*, 161 Ariz. 551, 779 P.2d 1290 (App.1989) (the paging system used at the Madison Street Jail Law Library was a constitutionally permissible alternative to

direct access to the library provided a paralegal assisted the inmate). In the absence of an alternative, the Department must permit legal assistance among inmates. *See Johnson v. Avery,* 393 U.S. 483, 489–90, 89 S.Ct. 747, 751, 21 L.Ed.2d 718, 723–24 (1969). However, the Department may impose reasonable restrictions "upon the acknowledged propensity of prisoners to abuse both the giving and the seeking of assistance in the preparation of applications for relief." *Id.* at 490, 89 S.Ct. at 751, 21 L.Ed.2d at 724.

Here, White does not argue that he was denied physical access to an adequate legal library. Accordingly, the trial court concluded that the Department's decision to deny White the assistance of Conn and to provide White with a different legal assistant did not deprive White of access to the courts.

We agree with the trial court that an inmate does not have the right to any particular legal assistant. *See Gometz v. Henman,* 807 F.2d 113, 116 (7th Cir.1986) ("[the legal assistant] does not offer us any reason to believe that he is the only prisoner in the federal system who can satisfy [the inmate's] legal needs; we cannot imagine why [the legal assistant] would be."); *Storseth v. Spellman,* 654 F.2d 1349, 1353 (9th Cir.1981).

White argues in the alternative that he was denied the help of any legal assistant, not just Conn. On appeal the Department asserts that White was offered the help of other legal assistants. White did assert in his October 18, 1988, letter that he was denied the help of any legal assistant.

In response to White's October 18, 1988, letter, the trial court concluded that White was articulate and able to make appropriate use of legal authority. As we have previously noted, adequate library facilities were available to White. Neither party cites any decisions concerning whether an inmate is, in fact, denied access to the courts when the record demonstrates that he is articulate and able to make appropriate use of legal authorities available to him.

We note that other courts have held that an inmate's participation in litigation demonstrated that the inmate had not, in fact, been denied access to the courts. *See, e.g., Conway v. Oliver,* 429 F.2d 1307, 1308 (9th Cir.1970) ("1) During, and immediately subsequent to, the time plaintiff alleges he was deprived of reasonable access to the courts the District Court of Appeals for the First District of California received one brief and two written motions from plaintiff; 2) During the time plaintiff alleges that he was deprived of reasonable access to the courts the Supreme Court of the United States received a petition for a writ of habeas corpus as well as a 70 page, well documented, petition for writ of certiorari; and 3) Within the last 3 years, plaintiff has filed three suits in this Court coupled with numerous papers and motions pertaining thereto."); *Bryant v. Craven,* 415 F.2d 775, 776 (9th Cir.1969) ("the extensive briefs filed by appellant in this proceeding, and the voluminous citations contained therein demonstrate no such denial [of access to the courts]"). *See generally,* Annotation, *Relief Under Federal Civil Rights Acts to State Prisoners Complaining of Interference With Access to Courts,* 23 A.L.R.Fed. 6, § 5 (1975).

The trial court concluded that White's letters to the trial court demonstrated that he was articulate and able to make appropriate use of legal authority. On the record submitted to us, we cannot say that the trial court abused its discretion in arriving at that conclusion.

## CONCLUSION

Because White could have responded to the Department's motion for summary judgment, the trial court did not err in holding that he was not denied access to the trial court. On the facts appropriately presented to the trial court, its decision was clearly correct. As previously noted, although given several opportunities to do so, White did not file any affidavits controverting the Department's statement of facts. We further note that, with the possible exception of the claim that he was denied the assistance of not only Conn, but

of any other inmate, White has not even argued that the actual facts presented by the Department are not true. Thus, White's objection to the granting of the Department's motion for summary judgment was not only procedurally defective, but was also without merit substantively. Under the Supreme Court's decision in *Bounds, supra,* an inmate is not entitled to receive assistance from an inmate legal advisor if the inmate is given access to an adequate legal library. Therefore, if we assume, contrary to the Department's position, that White was denied assistance from any inmate legal advisor, the trial court's decision was nevertheless correct.

For the reasons stated in this decision, the judgment entered by the trial court is affirmed.

JACOBSON, P.J., concurs.

*Note:* Retired Judge LEVI RAY HAIRE was authorized to participate in this appeal by order of the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. 6, § 20, and A.R.S. § 38–813.

LANKFORD, Judge, dissenting.

This is an action filed by a prisoner, Steven White, acting without the benefit of legal counsel. White claims that the defendant, director of the Arizona Department of Corrections, violated White's constitutional rights. White seeks relief under the first, eighth and fourteenth amendments to the United States Constitution. Such claims are recognized under 42 U.S.C. § 1983, the federal civil rights statute.

The superior court summarily rejected White's claims and entered judgment against him without a trial.

White's appeal requires resolution of two questions. First, should a trial court enter summary judgment against a pro per litigant regardless of the merits of his case and based solely on procedural deficiencies which the litigant might correct if he were given the opportunity to do so? Second, does the record in this case, viewed in favor of appellant, reveal a genuine issue of material fact which precludes summary judgment?

Because in my view the majority answers these questions incorrectly, I dissent. In so doing, I of course do not assess the truth of White's claims and therefore do not intimate any view as to whether the trier of fact would agree with them. I dissent only because I believe that on the present record the plaintiff is entitled to have the trier of fact hear and decide his claims.[1]

I.

I believe it necessary to state some additional facts to illustrate the nature of the plaintiff's claims. In doing so, I have attempted to avoid repeating the factual statement in the majority opinion except when necessary to understand the context.

White's verified complaint alleged that the Department of Corrections policy regarding the provision of necessities to indigent inmates violates White's rights under the United States Constitution.

White contended that he is indigent but that the Department refuses to grant him indigent status. White also claimed that the policy impermissibly forces non-indigent inmates to choose between personal cleanliness and access to the courts. He alleged that because he has several cases pending in the courts, he must spend most of his funds on photocopying, leaving him

---

1. In reviewing a summary judgment, this court must view the evidence in the light most favorable to the party opposing the motion, and must give that party the benefit of all favorable inferences that may be reasonably drawn from the evidence. If when viewed in that manner the evidence is such that reasonable persons might reach different conclusions as to whether there is a genuine issue as to any material facts, the judgment must be reversed. *State ex rel. Corbin v. Challenge, Inc.,* 151 Ariz. 20, 725 P.2d 727 (App.1986). This is the same standard as that used by trial courts in ruling on the summary judgment motion; thus, appellate review is essentially de novo. *United Bank of Arizona v. Allyn,* 167 Ariz. 191, 805 P.2d 1012 (App.1990). In my judgment, the majority applied an incorrect standard of review when it stated (At 81–82, 804 P.2d at 810–811) that the superior court did not abuse its discretion by finding that White was capable of representing himself without any assistance.

without funds to purchase hygiene supplies.

White filed a motion for order to show cause with his complaint seeking an order requiring the Director to treat him as indigent and provide him with certain supplies and free mailing of legal correspondence. White attached an affidavit stating that although he was not classified as an indigent, his prison account balance was only nine cents. The Director responded to White's motion and argued that its application of the indigency policy to White had not precluded him from filing his lawsuits.

Shortly thereafter, Jerry M. Conn wrote to the court, identifying himself as an inmate and a "jailhouse lawyer" assisting White with the lawsuit. The letter stated that because White was not eligible for indigent status, and had no funds, he would be unable to reply to the Director's pleadings. Conn requested a court hearing on White's claim.

White ultimately filed a reply in support of his motion and included his affidavit stating that his "ability to mail out anything has been severely hampered due to his lack of funds to pay for the postage, and ineligibility for 'indigent' status."

The superior court denied White's motion.

Soon thereafter, White moved for an order to "provide plaintiff with an alternative means of access to the courts." The superior court denied White's motion, finding that it did "not come within the purview of the legal issues to be presented to this court."

White then renewed his motion for an order to show cause. His attached affidavit stated that at the time he was no longer classified as indigent. However, White claimed that the Department had charged him for "free" items even when he had held indigent status. Apparently, White's prison account was debited for some "free"

items.[2] Later, when he received some funds, the Department charged his account for these items, leaving him without any remaining funds. White stated that he had exhibits and documents to support his motion, but could not provide them to the court because he lacked the financial means to copy and send them. This version of the facts is supported by the department's own documents, which indicate that White's access to the library photocopy machine was terminated.

The superior court denied White's renewed motion for an order to show cause.

White's legal assistant, Conn, again wrote to the court. Conn indicated that he had prepared discovery requests on White's behalf, but that White could not afford to mail them. Conn stated that "unless something is done, Mr. White will simply not be able to continue prosecuting his case—which deals, in part, with this very problem; his lack of meaningful access, or hampered access to the courts."

The Director then filed his motion for summary judgment. After the Director filed his motion, prison officials placed White in "investigative lockup" detention. He was not permitted to communicate with Conn or with any other legal assistant. The prison apparently kept White in isolation until after the due date for his response to the Director's summary judgment motion.

White then sought an extension of time to respond to the motion for summary judgment based on his inability to speak to his legal assistant. Conn's attached declaration stated that his request to see White to prepare a response had been refused, and that he had been forbidden to see White until just two days before the response was due.

The superior court granted White's motion for an extension.

**2.** As the majority notes (Maj. at 78, 804 P.2d at 807), White did receive some sanitary supplies. However, the affidavit of the department's own correctional services officer reveals that White did not receive free supplies during the entire period he was on the indigency list, and that White did not receive the full complement of supplies to which he was entitled. For example, White would receive a razor but no soap to shave with. Moreover, the officer's affidavit failed to dispute White's claim that his account was debited for these supposedly "free" items.

Conn again wrote the court, stating that not only had he been denied the promised visit to White, but had been denied any access to White since his detention. Conn also claimed that prison officials had forbidden him to act as White's legal assistant and that they had "bared [sic] all communication between us." Conn asserted that White's lockup was a pretext to punish White for bringing this action or to "sabotage" White's ability to prosecute the case. Conn specifically claimed that the actions of the Department's employees in placing White in lockup and rescinding Conn's authorization to assist White were "an obstruction of White's access to the courts." According to Conn, prison officials had allowed White to choose Conn from a group of authorized legal assistants.[3]

White wrote to the court after he had been released from detention. He told the court that he had "made several requests to have a legal assistant appointed to assist me," but that his requests had been ignored. White professed his inability to respond to the summary judgment motion without aid of "a legal assistant who knows what he is doing in law."

The court treated White's letter as a "motion claiming interference with legal process," and ordered the Director to respond. The court also extended the time for White's response to the motion for summary judgment.

The Director then responded to White's "motion claiming interference with legal process," explaining that White had been placed in detention because he and Conn had intimidated an inmate law clerk. The Director further contended that White's discovery requests demonstrated either White's ability to litigate for himself or the availability of legal assistance. White then wrote to the court explaining that the discovery requests had been prepared *prior* to White being placed in detention, and that

"defendant's counsel was aware of that fact." White asked that the court either require proof of "a legitimate reason why Conn should not be permitted to assist [me] with this case" or appoint counsel for White.[4] White later wrote to the court again and complained that prison officials still denied access to a copying machine even though he was then classified as an indigent.

The court responded by again extending White's time to respond to the summary judgment motion. More importantly, the court also rejected White's claim that he had been denied necessary legal assistance. The court held that White had no right to a particular legal assistant and that "Defendant's decision to provide Plaintiff with a different legal assistant" did not violate White's rights.

The superior court's order did not address White's claim that he had been denied the help of *any* legal assistant, and indeed assumed that the Department of Corrections had provided White with another legal assistant.

White again wrote to the court, stating that "I am still without *any* help in pursueing [sic] this matter." (Emphasis added). White requested that "a telephonic hearing be held where the Warden can be required to explain how I may obtain legal assistance in this case."

For reasons not apparent from the record, this letter, dated September 12, 1988, was not filed with the court until October 20, 1988. On October 12, 1988, the superior court entered summary judgment in favor of the Director.

White wrote to the court, asking it to reconsider its ruling. Referring to the court's finding that the record is deficient, White reiterated that he had been denied all legal assistance, and not just the help of a particular assistant. "I have submitted

---

3. The superior court was by now aware that Conn was serving as White's "lawyer" and that prison officials had authorized Conn to assist White in the pursuit of this claim. However, the record fails to show that the court either considered Conn's letters or responded to them.

4. The superior court never responded to either White's request for court order or his motion for appointment of counsel. While a trial court need not grant such a motion, the court must rule on a motion for appointment of counsel. See *Alexander v. Ramsey*, 539 F.2d 25 (9th Cir. 1976).

several requests [to prison officials] for the appointment of a legal assistant to help me with this case. I have received no response from defendants."

White requested that the superior court treat his letter as a notice of appeal, if the court were to deny relief.

White's letter directed the superior court's attention to the ruling by the United States District Court for the District of Arizona in *Gluth v. Arizona Department of Corrections*, No. 84–1626 PHX CAM.[5]

In that case, the prisoner/plaintiff, suing on behalf of prisoners confined at the state correctional facility in Florence, sought improved access to the courts on behalf of inmates. The Department of Corrections did not dispute several facts relevant to White's claim here: (1) some prisoners, confined to their cells are not allowed access to the prison law library; (2) inmate legal assistants are not given additional time to work on their "clients'" cases; (3) inmate requests to communicate with their legal assistants have been lost, ignored or denied by prison staff.

In stark contrast to the result reached here, the district court in *Gluth* granted summary judgment in favor of the prisoner and made the following findings:

(1) Prisoners denied meaningful direct access to the prison law library must receive assistance from someone trained in the law.

(2) The prison had a history of arbitrarily denying prisoners library access.

(3) The prison's indigency policy was unacceptable because it forced inmates to chose between purchasing essential hygienic supplies and essential legal supplies.[6]

Pursuant to this judgment, the district court issued a permanent injunction. The court *inter alia* ordered the defendants to: systematize the provision of inmate legal assistants; respond within 48 hours to requests for inmate legal assistance; ensure that a meeting between the inmate and the assistant occur within 72 hours of such a request; and promptly find a replacement assistant when an inmate can no longer assist his assigned inmate/client.

The court also ordered that the defendants: adopt an indigency standard high enough that inmates need not forego basic legal supplies to purchase minimum hygiene supplies; refrain from calculating indigency on a thirty day basis, and instead determine indigency based on the inmate's highest account balance in the fourteen-day prisoners' pay period; provide legal supplies to an inmate who faces a court deadline of less than a week and has a current account balance of less than the indigency standard; and provide an inmate with emergency help to meet a court deadline even if he had an account balance greater than the indigency standard at some time during the past 14 days.[7]

The *Gluth* court stated for the record that the injunction "marks the successful partial completion of a case the likes of which I have never before seen in my twenty-five years on the bench." The court went on to state: "Despite the seriousness of plaintiff's complaints, defendants demonstrated, throughout this litigation, a callous unwillingness to face the issues. The Court was forced to take extraordinary measures to compel the Arizona Department of Corrections to focus on the merits." As White argues, the findings in *Gluth* illustrate the seriousness of White's claims here. *Cf. Vaughn v. Trotter*, 516

5. Samuel Lewis, Director of the Arizona Department of Corrections and defendant here, was added as a defendant in *Gluth* upon taking office in 1984.

6. The majority concludes that adequate library facilities were available to White. (Maj. op. at 81, 804 P.2d at 810). Although White made no claim that the library was inadequate or unavailable, that merely means that library access was not an issue in this case. There is no

evidentiary basis for a conclusion that the library was adequate and available. The district court's findings in *Gluth, supra,* were based on evidence. That court concluded that some prisoners were arbitrarily denied access to the library.

7. The injunction is subject to modification by the district court upon receipt of the final portion of a report by a special master.

F.Supp. 886, 890 (M.D.Tenn.1980) ("[T]he circumstances must be viewed in their totality, not seriatim or piecemeal.")

The superior court treated White's letter as a motion to reconsider and denied the motion. The court found that White's letters "indicate that he is articulate and, apparently, able to make appropriate use of legal authority."

## II.

### A.

The majority's view allows a trial judge to toss a litigant out of the courthouse without a fair opportunity to be heard. The majority would dismiss White's claims on a technicality, without allowing him the opportunity to create the record necessary to show that a genuine dispute exists, and without regard to whether White's letters create a genuine dispute of material fact which warrants a trial.

The majority apparently holds that plaintiff's efforts to secure justice may be ignored because they did not fit the correct procedural patterns: (1) his letters to the court did not constitute a formal "answering memorandum" to the summary judgment motion as required by Rule IV, Uniform Rules of Practice of the Superior Court; and (2) he failed to call the trial judge's attention specifically to the sworn statements of fact in his verified complaint already in the court's file.

The majority is also unmoved by the plaintiff's claim that the Director's interference with plaintiff's constitutional right of access to the courts rendered him unable to properly respond to the defendant's motion. The majority believes that because the plaintiff sent comprehensible letters to the trial judge, plaintiff is capable of prosecuting a federal civil rights claim with no assistance whatever.

I cannot agree that a court may summarily reject the substance of the plaintiff's claims on these grounds.

The courts do not treat a litigant fairly when they insist that the litigant—unaided and unable to obtain the services of a lawyer—negotiate a thicket of legal formalities at peril of losing his or her right to be heard. Such a practice manifestly excludes the poor and the unpopular, who may be unable to obtain counsel, from access to justice.

It is now beyond any doubt that the appellant, other prisoners, and indeed every person has a right of access to the courts which is protected by the United States Constitution. *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). This right of access extends to the assertion of civil rights claims such as those made here. *Wolff v. McDonnell, supra.* Through the due process clause of the Fourteenth Amendment, the Constitution commands that the States honor the right of access to the courts. *See Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). This right encompasses both the right to some form of legal assistance when needed and the individual's right to represent himself in court. The right to appear *in propria persona* is well established in Arizona and elsewhere. *See State ex rel. Frohmiller v. Hendrix,* 59 Ariz. 184, 124 P.2d 768 (1942).

Although every person has a right of access to the courts, the state has a particular obligation to preserve that right in cases such as this one. The plaintiff here is handicapped both by his indigence and his incarceration. Moreover, the plaintiff asserts a claim of "fundamental importance," a claim that his constitutional rights were violated. *Bounds v. Smith,* 430 U.S. 817, 827, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). *See also Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled in part on other grounds by Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (right of access to courts to assert a 42 U.S.C. § 1983 civil rights claim); *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (Section 1983 claim); *Wolff v. McDonnell, supra* (Section 1983 claim). The state's obligations also arise in

habeas corpus proceedings. *Johnson v. Avery, supra.*

The constitutional right of access demands that the courts provide the litigant "an adequate opportunity to present his claims fairly." *Ross v. Moffitt,* 417 U.S. at 616, 94 S.Ct. at 2447. For this right to be vindicated, the state must not only refrain from interfering with access to the courts, but must also discharge certain affirmative obligations to make that access meaningful. *Bounds v. Smith, supra.*

Meaningful access requires some tolerance by courts toward litigants unrepresented by counsel. *Pro per* litigants are by no means exempt from the governing rules of procedure. But neither should courts allow those rules to operate as hidden, lethal traps for those unversed in law. This may require some degree of extra care and effort on the part of trial judges who already labor long and hard at a mushrooming caseload.[8] But the alternative slams the courthouse door in the face of those who may be in greatest need of judicial relief, all for the sake of ease of administration. This latter course is one which I believe our Constitution does not permit and that we as judges should not tolerate.

Indeed, it is sadly ironic that the majority holds that procedural barriers block judicial relief when one of the plaintiff's claims is that defendant denied him the legal assistance which plaintiff needed to overcome those barriers. It is in precisely such a case that the plaintiff should receive the most assiduous judicial protection. "[T]he recurrent judicial attitude [is] that the right of access to the courts is afforded special protection.... 'An inmate's right of unfettered access to the courts is as fundamental as any other he may hold.... All other rights of an inmate are illusory without it....'" *Taylor v. Sterrett,* 532 F.2d 462, 470 (5th Cir.1976) (quoting *McCray v. Sullivan,* 509 F.2d 1332, 1337 (5th Cir.), *cert. denied,* 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975)). As the United States Supreme Court has suggested, preserving the right of access in a case such as this is particularly important. "[T]his Court has 'constantly emphasized,' [that] habeas corpus and civil rights actions are of 'fundamental importance ... in our constitutional scheme' because they directly protect our most valued rights." *Bounds v. Smith,* 430 U.S. at 827, 97 S.Ct. at 1498 (quoting *Johnson v. Avery,* 393 U.S. at 485, 89 S.Ct. at 749).

### B.

The plaintiff alleged a number of infringements upon his constitutional right of access to the courts. He claimed that he was not supplied with paper and other supplies necessary to prepare legal documents despite his indigence. He alleged that he was deprived of access to his authorized "jailhouse lawyer," and indeed that he had been denied access to *any* counsel or surrogate legal counsel. In fact, White alleged that the defendant had attempted to sabotage this litigation in midstream by barring the plaintiff from communicating with his prison-approved legal assistant.

When White first complained that prison officials were interfering with his prosecution of this case, and asked for an alternative means of access, the court did not even reach these questions because it incorrectly determined that they were not issues in the case. Later, the court did address White's complaints, treating them as a motion claiming "interference with legal process." The superior court acted correctly in reversing course to address this issue. An inartful attempt by a *pro se* litigant to present a claim cannot be rejected without considering the claim or providing a reasonable opportunity for the litigant to articulate the claim. *See Gordon v. Leeke,* 574 F.2d 1147, 1152 (4th Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).

---

**8.** However, the vast majority of prisoner civil rights actions are probably filed in federal court, not in state courts. Moreover, the court's powers of dismissal and summary judgment enable courts to dispose of unmeritorious claims of this type without imposing stringent, technical pleading requirements. *See* Blaze, *Presumed Frivolous: Application of Stringent Pleading Requirements in Civil Rights Litigation,* 31 William & Mary L.Rev. 935 (Spring 1990).

Prison officials may not burden a prisoner's right of access to the courts except for substantial need which cannot be met by less burdensome alternatives. Regulations and actions which unjustifiably obstruct the prisoner's access to legal representation or legal assistance are simply invalid. *Procunier v. Martinez, supra.* In *Procunier*, the Supreme Court struck down a prison regulation limiting prisoners' legal assistance to lawyers and forbidding the use of law students and paraprofessionals to interview prisoners.

The assistance of a person knowledgeable in the law is frequently indispensable to a meaningful access to the courts and therefore the ability to rely on such a person for assistance in presenting a claim is part of the constitutional right of access. The majority correctly notes that access to the courts *may* be provided by either adequate law libraries *or* adequate assistance from persons trained in the law. (Maj. op. at 80, 804 P.2d at 809). However, a library will not satisfy the constitutional mandate in every case, and the United States Supreme Court has so stated.

Although prisoners' access to legal materials might in some cases allow them to pursue their claims, *Bounds v. Smith*, more often the prisoner needs the help of a lawyer, a paralegal, or a "jailhouse lawyer." The United States Supreme Court has declared: "Where an illiterate inmate is involved, ... or whether the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid ..." *Wolff v. McDonnell*, 418 U.S. at 570, 94 S.Ct. at 2982. Many prisoners are illiterate, poorly educated, or of limited intellectual capacity, or speak, read, and write well only in another language such as Spanish.[9] "[F]or all practical purposes, if such prisoners cannot have the assistance of a 'jailhouse lawyer,' their possibly valid constitutional claims will never be heard in any court." *Johnson v. Avery*, 393 U.S. at 487, 89 S.Ct. at 750 (quoting district court finding which Supreme Court upheld). "In the case of all except those who are able to help themselves—usually a few old hands or exceptionally gifted prisoners—the prisoner is, in effect, denied access to the courts unless such help is available." *Id.* at 488, 89 S.Ct. at 750. In *Johnson v. Avery*, the Supreme Court invalidated a prison ban on inmate assistance to other inmates in preparing habeas corpus petitions.

The state's obligation clearly includes refraining from obstructing the prisoner's access to legal assistance. The state is not always obligated to provide a lawyer at state expense to prosecute a civil rights action such as the one brought by the appellant here. However, some form of legal assistance adequate to enable the prisoner to obtain a meaningful opportunity to be heard in court—a law library, knowledgeable fellow prisoners, or lawyers—must be available to indigent inmates to satisfy the state's obligations under our federal constitution. The ultimate burden of proving that the prisoner has adequate access to the courts rests with the state once the prisoner makes a *prima facie* showing of lack of access. *Rich v. Zitnay*, 644 F.2d 41, 43 (1st Cir.1981); *Carter v. Fair*, 786 F.2d 433 (1st Cir.1986).

There is a genuinely disputed issue in this case as to whether the state has obstructed the plaintiff's access to legal assistance. White has stated that his access to the prison-approved legal assistant was maliciously terminated and that his requests for substitute aid were ignored. He also alleges that the defendant interfered with his relationship with his assistant in an attempt to sabotage this case and placed him in isolated detention to punish him for prosecuting this case. If his letters and those of his fellow inmates can be considered as evidence, then White has

---

**9.** "[R]eading materials commonly found in a law library make for tediously difficult reading, generally on a college or college graduate level." *Stevenson v. Reed*, 391 F.Supp. 1375, 1379 (N.D. Miss.1975), *aff'd and opinion adopted*, 530 F.2d 1207 (5th Cir.), *cert. denied*, 429 U.S. 944, 97 S.Ct. 365, 50 L.Ed.2d 315 (1976).

presented a *prima facie* claim of denial of his constitutional right of access to the courts which precludes summary judgment.

The superior court apparently accepted the letters as evidence, for it addressed White's claim on its merits. Moreover, the Director never objected to considering the letters as evidence in connection with the motion for summary judgment. In fact, the Director asked for and received a court order requiring White to send the Director copies of all letters addressed to the court so that the Director could respond to them.

The majority dismisses the evidence on two grounds. First, it says that a prisoner is not entitled to the assistance of a particular legal assistant. White claims a more serious deprivation than this, however: he states that the defendant interfered with his access to *any* assistance. This claim was ignored below. The majority opinion of this court states only that the Department alleges for the first time on appeal that it made other assistance available to White. (Maj. op. at 81, 804 P.2d at 810). Of course, such a bare contention fails both because it is not evidence and because it comes too late on appeal. *See Lujan v. MacMurtrie*, 94 Ariz. 273, 383 P.2d 187 (1963) (mere allegations cannot create fact issue); *Dillon–Malik, Inc. v. Wactor*, 151 Ariz. 452, 728 P.2d 671 (App.1986) (appellate court will not consider new arguments on appeal).

Nor can I agree that the state may deny access to the prisoner's legitimately chosen and prison-approved source of legal assistance on the theory that he might obtain help elsewhere. While I might agree that as an initial matter prison authorities may not be obligated to allow a prisoner to choose any inmate he wishes to assist him, once prison officials permit the prisoner to choose, they may not negate that choice without justification. Apparently, the Department allowed or approved White's choice of Conn as his assistant and then interfered with their ability to communicate.

To forbid the prisoner from contact with his chosen "jailhouse lawyer" interferes with the legal assistance essential to access to the courts. The "jailhouse lawyer" is, as the name implies, a substitute for a lawyer. Surely we could not approve a prison's action in forbidding for no reason a prisoner's communications with his lawyer. "Restrictions may not be placed upon the attorney-client relationship which effectively diminish a prisoner's access to the courts." *Taylor v. Sterrett*, 532 F.2d 462, 473 (5th Cir.1976).

There is no less of a burden and no less of a constitutional violation in taking the same action with regard to surrogate counsel. "Logic demands that if inmate mutual assistance is constitutionally required, the state, through its agents, may not harass, intimidate, or otherwise interfere with those inmates who have undertaken to provide legal assistance to other inmates." *Vaughn v. Trotter*, 516 F.Supp. at 892–93.

The cases on which the majority relies for its decision are readily distinguishable. In *Storseth v. Spellman*, 654 F.2d 1349 (9th Cir.1981), the court did *not* approve of the action taken here—cutting off a prisoner's access to his chosen legal assistant in the middle of a lawsuit. In *Storseth*, the district court appointed counsel for the prisoner, but the prisoner insisted on using his jailhouse lawyer. The court's holding was not that a prisoner can be cut off from his jailhouse lawyer and left without a substitute, but that trained legal counsel was available and satisfied the constitutional requirements. 654 F.2d at 1353. Even that limited holding is suspect, however. *See Procunier v. Martinez, supra* (invalidating prison ban on inmate communication with law students and paralegals even though inmates were represented by lawyers).

Nor does *Gometz v. Henman*, 807 F.2d 113 (7th Cir.1986), support the notion that prison officials may interfere with a prisoner's relationship with his legal assistant during a pending lawsuit against the prison. In that case, no lawsuit was pending when the prison prevented the plaintiff, a jailhouse lawyer, and another inmate from corresponding. More importantly, the prison had a demonstrable, substantial reason for preventing communication between

these two prisoners. The two were members of a "violent prison gang," the Aryan Brotherhood. The two prisoners had conspired together to murder and had in fact murdered a prison guard. 807 F.2d at 114. Moreover, the court noted that, in contrast to White's claim here, the prisoner had access to other jailhouse lawyers. Finally, the claim was brought not by the client prisoner, but by the jailhouse lawyer, whose standing the court questioned. 807 F.2d at 115.

The essential holding of *Gometz* is one not implicated here. *Gometz* merely reflects the principle that the state may reasonably regulate the prisoner's access to legal assistance to maintain prison security. However, when the state lacks a substantial, demonstrable reason to burden the prisoner's right of access, or when less burdensome means may be available to protect the state's interests, then a prison regulation which burdens access to the courts is invalid. *See Taylor v. List*, 880 F.2d 1040 (9th Cir.1989); *Taylor v. Sterrett, supra; Bryan v. Werner*, 516 F.2d 233 (3rd Cir.1975).

The second reason offered by the majority for ignoring the defendant's acts of interference is that the plaintiff's letters to the court were comprehensible and thereby demonstrated his ability to act as his own counsel in this case. There are two flaws in this reasoning.

First, the ability to write lucid letters is very different from an understanding of the law and an ability to marshall evidence in support of a claim. For example, few businessmen—who might be gifted letter-writers—would think themselves capable of prosecuting a complex lawsuit wholly unaided. Nor have the courts intimated that letter-writing demonstrates the ability to act as one's own lawyer. The cases cited by the majority involve extensive pleadings and briefs prepared by the litigant. (See maj. op. at 81, 804 P.2d at 810). On the other hand, the courts have voided prison regulations which forbid fellow inmate assistance to inmates with demonstrated literacy. *E.g., United States ex rel. Stevenson v. Mancusi*, 325 F.Supp.

1028, 1033 (W.D.N.Y.1971) (aid barred to inmates who tested above fifth grade reading comprehension level). The courts also regard papers such as White's letters—which contain few or no legal citations—as failing to demonstrate adequate capacity to litigate *in propria persona. E.g., Taylor v. List*, 880 F.2d at 1048.

The second flaw in the majority's reasoning is that the plaintiff's letters did not demonstrate any special competence or intelligence. In my opinion, the letters failed to show that plaintiff was one of the "few old hands [at jailhouse lawyering] or exceptionally gifted prisoners" capable of fending for themselves in a complex legal system. *Johnson v. Avery*, 393 U.S. at 488, 89 S.Ct. at 750. On the contrary, the letters reflect—both in their content and in the explicit statements made in them by plaintiff—that plaintiff was unable to proceed effectively without assistance. The very fact that the plaintiff wrote letters to the judge instead of filing the required answering memorandum with the clerk illustrates that the plaintiff was unable to proceed in the proper manner without assistance.

The majority also ignores the plaintiff's claim that he was placed in isolated detention as punishment for prosecuting this lawsuit or to impair his capacity to prosecute the case. The state simply may not completely deprive a prisoner of his right of access to the courts by placing him in isolation. *Knell v. Bensinger*, 489 F.2d 1014 (7th Cir.1973). The right of access means nothing if a prison can silence an inmate by placing him in a remote, solitary cell where he can make no pleas for justice. Nor may the state harass an inmate or one providing legal assistance to him in order to punish or deter exercise of the right of access. *Christman v. Skinner*, 468 F.2d 723 (2d Cir.1972) (prisoner); *Vaughn v. Trotter, supra* (jailhouse lawyer). While the prison officials may have been fully justified in placing White in punitive detention and perhaps in forbidding communication between White and Conn, this fact cannot be assumed and must be proved. This has not been established as an uncontroverted fact. The plaintiff's claims of

unconstitutional interference and retaliation should not be summarily rejected.

### C.

The majority also apparently concludes that plaintiff's claims may be summarily rejected because he did not file a formal answering memorandum to the defendant's summary judgment motion. It is true that the plaintiff did not file such a response with points and authorities and a serialized statement of facts contemplated by the rules. See Rule IV(a), (f), Uniform Rules of Practice of the Superior Court.

It is equally true, however, that plaintiff repeatedly responded to the defendant's motion by letters. The question is therefore not whether summary judgment may be entered based on the absence of any response, but whether summary judgment is warranted by the deficiencies in the form of plaintiff's response.

The authority cited by the majority for summary adjudication does not support such a disposition in this case. Rule IV(b), Uniform Rules of Practice of the Superior Court is a rule of general application to all civil motions, not just to summary judgment motions. The rule provides that failure to "file the required answering memorandum" in response to a motion "may be deemed a consent to the ... granting of the motion, and the court may dispose of the motion summarily." This rule addresses only a complete failure to respond to a motion, however, and not the situation in which the responding document fails to comply with requirements as to form and content. The rule thus simply does not apply to this case and does not authorize the entry of summary judgment.

Even if the rule were applicable to noncomplying documents, however, it would not authorize summary judgment. Rule 56 of the Arizona Rules of Civil Procedure governs summary judgment procedure. As this court explained in *United Bank of Arizona v. Allyn, supra,* Rule 56 by its terms does not permit the entry of summary judgment based on the absence of a response to the motion if the motion fails to demonstrate the movant's entitlement to judgment. The Arizona Supreme Court has noted that the failure to respond "does not in and of itself make the granting of summary judgment 'appropriate.'" *Northern Contracting Co. v. Allis–Chalmers Corp.,* 117 Ariz. 374, 377, 573 P.2d 65, 68 (1977). *Accord, State ex rel. Corbin v. Sabel,* 138 Ariz. 253, 674 P.2d 316 (App. 1983). In fact, this court has already specifically held that, in view of Rule 56, Rule IV does *not* allow a court to grant summary judgment simply for failure to file a response. *Choisser v. State ex rel. Herman,* 12 Ariz.App. 259, 469 P.2d 493 (1970). *See also Schuldes v. National Surety Corp.,* 27 Ariz.App. 611, 557 P.2d 543 (1976) (although a written response is required by Rule IV, and uncontested facts evidenced in the motion must be taken as true, the superior court still must determine whether the movant is entitled to judgment as a matter of law).

To summarily adjudicate the merits of a claim when the claimant is actively seeking to litigate also offends notions of fundamental fairness. Technical violations of the procedural rules are subject to lesser sanctions. Dismissal as a sanction is to be exercised with great caution. *Nesmith v. Superior Court,* 164 Ariz. 70, 790 P.2d 768 (App.1990). Summary dismissal of an entire claim on its merits is a drastic sanction—indeed it is the ultimate sanction—and is reserved only for willful and substantial abuses or a complete failure to prosecute the case. As the United States Supreme Court noted in overturning a dismissal enforced as a Rule 37 discovery sanction: "[T]here are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause." *Societe Internationale v. Rogers,* 357 U.S. 197, 209, 78 S.Ct. 1087, 1094, 2 L.Ed.2d 1255 (1958).

Our supreme court has stated:

Prior to dismissal or entering a default judgment, fundamental fairness should require a district court to enter an order to show cause and hold a hearing, if deemed necessary, to determine whether

assessment of costs and attorneys fees or even an attorney's citation for contempt would be a more just and effective sanction.

*AG Rancho Equipment v. Massey–Ferguson, Inc.*, 123 Ariz. 122, 124, 598 P.2d 100, 102 (1979) (quoting *Edgar v. Slaughter*, 548 F.2d 770, 772 (8th Cir.1977).

As has been repeatedly held in other contexts, summary adjudication based on procedural defects is contrary to Arizona's longstanding public policy favoring resolution of disputes on their merits. *Walker v. Kendig*, 107 Ariz. 510, 489 P.2d 849 (1971); *U–Totem Store v. Walker*, 142 Ariz. 549, 691 P.2d 315 (App.1984). The Arizona courts also refuse to permit procedural rules from becoming a "shield for serious inequity." *Hosogai v. Kadota*, 145 Ariz. 227, 231, 700 P.2d 1327, 1331 (1985).

Both of these basic principles of Arizona jurisprudence found expression in *Gorman v. City of Phoenix*, 152 Ariz. 179, 731 P.2d 74 (1987). In *Gorman*, the plaintiff's case had been dismissed for her counsel's failure to comply with the "fast track" rule, Rule V(e), Uniform Rules of Practice of the Superior Court. The superior court denied the plaintiff's motion pursuant to Rule 60(c), Ariz.R.Civ.P., for relief from the dismissal. Our supreme court's observations about the application of Rule V(e) to dismiss that case suggest that the application of Rule IV(b) to support summary judgment in this case would be improper:

> Uniform Rule V ... should not be used to trap the unwary or the momentarily negligent. The purpose of Uniform Rule V(e) is procedural, not substantive; the rule is merely 'a convenient administrative practice' ... Uniform Rule V(e) should not be used to win a case by avoiding trial on the merits, unless the case, in fact, is not being prosecuted vigorously.... [The rule] is not a weapon to be used to deny relief to those who are pursuing their claims and seeking their day in court.

152 Ariz. at 183, 731 P.2d at 78.

This preference for adjudicating on the merits rather than on technicalities applies with at least as much force to *pro per* litigants as to those acting with the benefit of counsel:

> Implicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training. While the right 'does not exempt a party from compliance with relevant rules of procedural and substantive law,' ... it should not be impaired by harsh application of technical rules.

*Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (citation omitted).

If the *pro per* litigant fails to comply with procedural rules despite the availability of adequate legal assistance, or in the face of clear knowledge of how to comply with these rules, the court may treat him or her as it would treat any other party in violation of the rules. The law requires only a reasonable tolerance by the courts, and not acceptance of bad faith, apparent lack of diligence or wholesale violations despite the availability of assistance. None of these circumstances appear on the record in this case.

The majority holds the plaintiff to the same standard as a trained lawyer. Yet the courts are ordinarily protective of a *pro se* prisoner's right to be heard, tolerating minor procedural breaches and guiding the litigant through the thicket of procedural rules. It is settled that a *pro per* prisoner's pleadings—such as White's letters to the court—should be held to a much less stringent standard than counsel's. *E.g., Akao v. Shimoda*, 832 F.2d 119 (9th Cir. 1987), *cert. denied*, 485 U.S. 993, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988). This rule, often applied to the interpretation of prisoners' complaints, extends "to form a general standard. Once a *pro se* litigant has done everything possible to bring his action, he should not be penalized by strict rules which might otherwise apply if he were represented by counsel." *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir.1989). *See also Brown v. State*, 117 Ariz. 476, 573 P.2d 876 (1978); *Goodman v. State*, 96 Ariz. 139, 393 P.2d 148 (1964) (courts look

to substance, not form, and will treat *pro per* petition for *habeas corpus* as special action petition).

The rule of leniency toward *pro se* prisoner litigants has been applied many times in the context of a defendant prison official's motion for summary judgment against a prisoner. The result in those cases has been quite different from that reached by the majority here. At the very least, the litigant is entitled to be warned that when he is confronted by a summary judgment motion, he must obtain counter-affidavits or other evidentiary material to avoid the entry of judgment against him. *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir.1975); *Madyun v. Thompson*, 657 F.2d 868 (7th Cir.1981); *Hudson v. Hardy*, 412 F.2d 1091 (D.C.Cir.1968). Despite the salutary effect of summary judgment in eliminating insubstantial claims, "an overriding interest must be fairness to the parties, especially where important constitutional rights are asserted." *La Batt v. Twomey*, 513 F.2d 641, 650 (7th Cir.1975).[10]

The majority also believes that White's verified complaint—a sworn document which Rule 56(c) expressly contemplates will be considered in connection with a summary judgment motion—need not be considered because it was not brought to the attention of the trial judge in connection with the summary judgment motion. This position directly conflicts with the longstanding judicial tolerance of ignorance of the rules and minor rule infractions by *pro per* litigants.[11] "Technical rigor in

dealing with summary judgment procedure is inappropriate where unrepresented and uninformed prisoners are involved." *Madyun v. Thompson*, 657 F.2d at 877. A review of the verified complaint is an insignificant burden. The loss of a claim on the merits is, in contrast, a very significant event indeed. As our supreme court has observed: "There can hardly be any prejudice greater than the complete loss of a cause of action." *Jepson v. New*, 164 Ariz. 265, 792 P.2d 728 (1990).

For these reasons, I would reverse the judgment of the superior court and remand for further proceedings. I therefore respectfully dissent.

---

10. The courts also decline to enter summary judgment against a *pro se* prisoner merely because his assertions of fact are not in sworn, notarized form. In *La Batt, supra*, the court considered an unverified response to the summary judgment motion containing factual assertions and a statement that the prisoner was unable to obtain affidavits because of stringent security at the prison. 513 F.2d at 650. The court also considered the prisoner's verified complaint, even though it was not presented with the summary judgment papers. *Id.* at 651, n. 10. The court adopted a similar approach in *McLain v. Meier*, 612 F.2d 349, 356 (8th Cir. 1979). "[T]he requirements of the summary judgment rule may not be fairly applied 'with strict literalness' to a prisoner unrepresented by counsel and subject to the handicaps ... detention necessarily imposes upon a litigant." *Hudson v. Hardy*, 412 F.2d at 1094.

11. Not only should the standard expected of counsel not be applied to the *pro per* litigant, but the burden of reviewing the record on a motion for summary judgment is no longer the onerous obligation that it was when *Mast v. Standard Oil Co. of Cal.*, 140 Ariz. 1, 680 P.2d 137 (1984) was decided. Subsequent changes in the local rules of nearly every Arizona superior court preclude the routine filing of discovery papers such as interrogatory answers and deposition transcripts. *E.g.*, Rule 2.14, Local Rules of Practice of the Superior Courts, Maricopa County. Ordinarily, the only record which the trial judge must "search" in connection with the summary judgment consists of the verified complaint and verified answer, if any, and any papers filed in connection with the motion itself.